UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TIM JOHNSON,                           )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )     No. 3:05-0320
                                       )     JUDGE ECHOLS
THE SONGWRITER COLLECTIVE, LLC,        )
E. JEAN MASON, BUDD CARR,              )
ROBERT D'LOREN, and FORTRESS           )
CREDIT OPPORTUNITIES I, LP,            )
                                       )
          Defendants.                  )

<u>MEMORANDUM</u>

Pending before the Court are the Motion To Dismiss On Behalf Of Defendants The Songwriter Collective, LLC, E. Jean Mason and Budd Carr (Docket Entry No. 43), the Motion To Dismiss On Behalf Of Defendant Robert D'Loren (Docket Entry No. 63), and the Motion To Dismiss On Behalf Of Defendant Fortress Credit Opportunities I, LP (Docket Entry No. 33), to which Plaintiff has responded in opposition.

**I.  FACTS AND PROCEDURAL HISTORY**

The following facts are taken from the Amended Complaint ("the Complaint") and certain documents that are alleged in the Complaint, copies of which the parties have provided to the Court with their pleadings on the Motions to Dismiss.[1]  Plaintiff Tim Johnson ("Johnson") is a citizen of Williamson County, Tennessee.

_____

[1]The Court may consider the content of documents without converting a motion to dismiss to a motion for summary judgment so long as the documents are referenced in the complaint.  See <u>Weiner v. Klais & Co.</u>, 108 F.3d 86, 89 (6th Cir. 1997).

1

He is an accomplished songwriter whose music compositions have been performed by a number of recording artists. He derives his livelihood solely from songwriting. As composer of numerous music compositions which were transferred and assigned, in part, to EMI/Blackwood Music Publishing, Inc., Johnson possessed valuable copyright interests in, and rights to the licenses and revenues derived from, his music compositions ("Catalog Interest").

Defendant The Songwriter Collective, LLC ("the LLC") is a limited liability company organized under the laws of the State of Delaware. The LLC's principal place of business is in Franklin, Tennessee, and the LLC regularly conducts business in Nashville. Defendant E. Jean Mason ("Mason") served as Chief Operating Officer of the LLC. Defendant Budd Carr ("Carr") served as Chief Executive and Chief Creative Officer of the LLC. Mason and Carr are citizens of the State of California.

Defendant Robert D'Loren served as President and Chief Executive Officer of UCC Capital Corp. He is a resident of New York. Defendant Fortress Credit Opportunities I, LP ("Fortress") is a limited partnership organized under the laws of the State of Delaware. Its principal place of business is in New York.[2]

---

[2]The Complaint does not explain D'Loren's role in the matter at issue. In his Memorandum in Support of Motion to Dismiss, D'Loren states that he acted as a third-party financial advisor to the LLC in connection with the negotiation of a bridge loan made by Fortress to the LLC. Pursuant to an indemnity agreement between the LLC and UCC Capital Corp., D'Loren has filed a cross-claim against the LLC, Mason and Carr to recover any damages assessed against him in favor of Plaintiff Johnson in this case, as well as the cost of his defense.

2

In November or December 2003, the LLC, Mason and Carr sent to Johnson by mail three documents relating to the LLC: (a) the Songwriter Collective Handbook ("the Handbook"); (b) a copy of the operating agreement of the LLC (the "Operating Agreement"); and (c) a draft of the subscription agreement to be executed in connection with the purchase of membership interests in the LLC (the "Subscription Agreement"). Johnson alleges that the Handbook, the Operating Agreement, and the Subscription Agreement, denominated collectively the "Transactional Documents," constituted a solicitation of an offer to buy membership interests in the LLC. Defendants did not provide Johnson a private placement memorandum.

The Transactional Documents offered Johnson the opportunity to participate in an investment plan that would work as follows. Johnson would contribute to the LLC his Catalog Interest in return for Class A membership interests in the LLC. Within ninety (90) days of Johnson's contribution of his Catalog Interest, the LLC would enter into one or more secured long-term loans (collectively, the "Loan") collateralized by Johnson's Catalog Interest and the income derived from the music compositions of the other holders of Class A membership interests. Upon contribution of Johnson's Catalog Interest and the issuance of any debt securities by the LLC, a portion of the Loan or other debt proceeds, as applicable, would be distributed (the "Distribution") to each holder of a Class A membership interest, including Johnson. The amount of the Distribution would be based on the value of Johnson's Catalog Interest over the prior five years, as determined in accordance

3

with the terms of the Operating Agreement. As a holder of Class A membership interests, Johnson would also have a right to other distributions as set forth in the Operating Agreement.

According to Johnson, the Transactional Documents contained numerous representations relating to the LLC and the Class A membership interests, such as, the LLC would provide Johnson with "the ability to monetize" his catalog of music compositions and convert "royalties into cash flow"; the LLC would offer investors "multiple exit strategies" and "transparency in all financial reporting to its songwriters"; that Johnson would regain his Catalog Interest when he withdrew as an investor; the LLC would not charge excessive administration fees; and the LLC had "'brought together a highly-regarded team of music and financial industry professionals'" to manage the LLC and had identified "'an experienced team of executives to run the creative, licensing and administrative sides of the business.'" (Docket Entry No. 7, Amended Complaint ¶ 14.) Johnson alleges the LLC, Mason and Carr knew these statements were false and misleading when made, and the LLC, while required to pay the Distribution upon incurring any debt by the LLC, never paid the Distribution to Johnson or the other holders of Class A membership interests when obligated to do so.

Further, according to Johnson, the statements and representations in the Transactional Documents were subject to numerous risks and conditions that were not disclosed to Johnson. Such risks and conditions included: the LLC would be unable to obtain adequate financing, including the Loan, and therefore, would

be unable to pay the Distribution; in order to obtain adequate financing, the LLC would have to agree to certain restrictive covenants that would impair and/or eliminate its members' ability to withdraw from the LLC; the LLC would not have the cash or other resources necessary to service the Loan or any other debt incurred to fund its operations and thus, investors in the LLC risked losing all rights to and interest in their Catalog Interests in the event of a default on indebtedness of the LLC; the LLC might not be able to retain the "music and financial industry professionals" to manage the LLC or hire others capable of managing the creative, licensing, or administrative sides of the business; the LLC's management, royalty collection services and internal controls might not be adequate to ensure that the LLC received and collected all royalties owed to it; and the LLC might not attract a sufficient number of investors to enable it to carry out its business plan and provide investors with the benefits promised in the Transactional Documents. Johnson alleges the LLC, Mason, and Carr knew of these and other risks when they solicited his offer to purchase, but they failed to disclose such risks.

Relying on the representations in the Transactional Documents, Johnson executed a Subscription Agreement on December 12, 2003. Pursuant to the Subscription Agreement, in addition to purchasing Class A membership interests, Johnson also purchased Class C membership interests to allow the LLC to use his Catalog Interest as collateral to secure a bridge loan ("the Bridge Loan") to fund the operating costs of the LLC until it could finalize the Loan.

Upon entering into the Bridge Loan, Defendants promised to pay immediately to Johnson ten percent (10%) of his expected Distribution, although pursuant to the terms of the Operating Agreement, Johnson's Distribution was due upon consummation of the Bridge Loan. The same day, December 12, 2003, Johnson also executed the Operating Agreement, which set forth, without limitation, his rights and obligations as a holder of membership interests of the LLC, including his right to the Distribution if the LLC incurred any debt and his right to withdraw from the LLC if he met certain conditions.

Johnson alleges that the Subscription Agreement was contingent upon the LLC's acceptance of Johnson's offer to purchase membership interests and issuance of the membership interests to Johnson. According to the Complaint, the LLC did not accept Johnson's Subscription Agreement because it was unable to obtain a release of EMI/Blackwood's interest in Johnson's Catalog, and the LLC did not issue any membership interests to Johnson. Additionally, the LLC did not pay the Distribution or any other amounts to Johnson, although it did make payments to those whose offers were accepted.

From December 2003 through March 2004, Defendants purportedly performed financial due diligence on Johnson to determine his suitability as an investor in the LLC. Johnson sent to Defendants financial documentation, including tax returns, royalty statements, and other sensitive financial materials documenting the income he had received from his Catalog Interest over the prior five years.

Johnson alleges that, in fact, Defendants failed to perform financial due diligence to determine his suitability as an investor in the LLC. The rights to many of Johnson's songs are subject to a publishing agreement with EMI/Blackwood ("the EMI Agreement"). Pursuant to section 8.01 of the EMI Agreement, EMI possessed a right of first refusal and matching right to purchase the rights to the compositions covered by the EMI Agreement. Despite knowing the terms of the EMI Agreement, the LLC failed to obtain a waiver of those rights before purporting to take Johnson's Catalog Interest.

Prior to and immediately after Johnson executed the Subscription Agreement and the Operating Agreement, the LLC, Mason and Carr repeatedly told Johnson that the Loan would close in January or February 2004. When the Loan had not closed at the end of February, these Defendants advised Johnson that the closing was "imminent" in order to induce him not to withdraw his subscription. Johnson alleges that, at the time these Defendants made the statements, they knew, but did not disclose to Johnson or his agents, that no financial institution had agreed to enter into the Loan with the LLC.

Johnson further alleges that, during the period between November 2003 and February 2004, Defendants made numerous and repeated representations to him that they knew to be false or likely to be false in an effort to persuade him to join the LLC. Such representations included: (a) Defendant Mason and other agents of the LLC misrepresented to Johnson that he would realize a substantial annual writer's draw from the LLC; (b) Defendants Mason

7

and Carr, and other agents of the LLC, misrepresented to Johnson that he would receive a Distribution based upon Class A membership interests; (c) Defendants Mason and Carr, and other agents of the LLC, misrepresented to Johnson that the Loan would close in January or February of 2004; (d) Defendant Mason misrepresented to Johnson that the Loan and the Bridge Loan would be subject to an extremely favorable interest rate; (e) Defendant Mason failed to inform Johnson about the terms, restrictive covenants, risks and high interest rate of the Bridge Loan; (f) Defendant Carr misrepresented to Johnson that the only way he would lose money by joining the LLC would be in the case of a total collapse of the world's economy; and (g) Defendants did not inform Johnson that certain songwriters, such as Annie Roboff, were being promised exorbitant consulting fees ($600,000) to limit their personal risk in the event the LLC defaulted on the Loan or the Bridge Loan. Johnson was not offered a consulting fee to limit his personal risk in the event the LLC defaulted on the Loan or the Bridge Loan.

Johnson further alleges that, because the LLC was unable to secure the Loan, the LLC was forced to solicit the Bridge Loan. Pursuant to the terms of the Subscription Agreement, Johnson was entitled to ten percent (10%) of the expected Distribution upon acceptance of the Subscription Agreement and the closing of the Bridge Loan. In February 2004, the LLC presented to Johnson an Amendment to the Operating Agreement ("Amendment"). The LLC, through its agents, Chuck McNeal and Tom McHugh, told Johnson that

8

he had to execute the Amendment in order to receive proceeds from the Bridge Loan.

On or about February 12, 2004, Johnson asked McNeal and McHugh to quantify his financial risk in the event he signed the Amendment, contributed his Catalog Interest as collateral for the Bridge Loan and received proceeds therefrom in the amount of ten percent (10%) of his expected Distribution. McNeal and McHugh informed him that, in the event the LLC defaulted under the Bridge Loan, Johnson would be liable for his pro rata share of the Bridge Loan, or approximately $70,000 to $80,000. Johnson told McNeal and McHugh that he did not want to sign the Amendment because he could be liable potentially for $80,000 in the event of the LLC's default under the Bridge Loan.

Johnson additionally alleges that the next day, February 13, 2004, upon learning that Johnson did not intend to execute the Amendment, and needing Johnson's Catalog Interest to secure the Bridge Loan, the LLC, Mason, and D'Loren represented, in writing, to Johnson that: (a) Johnson would receive a distribution of $53,886.90 upon the closing of the Bridge Loan; (b) Johnson's EMI Catalog Interest would be pledged as collateral for the Bridge Loan; (c) the risk attributable to Johnson in the event of a default on the Bridge Loan would be 1.9%; and (d) the amount Johnson stood to lose, above the Distribution, for default on the Bridge Loan was $8,000, not the $80,000 he had been told the day before.

On February 13, 2004, relying on the representations of the LLC, Mason, and D'Loren, Johnson executed the Amendment and pledged his Catalog Interest as collateral for the Bridge Loan. Using Johnson's Catalog Interest as collateral, the LLC obtained the Bridge Loan from Fortress. Johnson alleges he did not receive any money or Class A or Class C membership interests upon the closing of the Bridge Loan, the LLC had no right to pledge his EMI Catalog as collateral because it was still subject to a right of first refusal and matching right in favor of EMI, and the amount of his personal liability on the Bridge Loan was actually $80,000, not $8,000. Johnson further alleges that the Defendants knew their February 13, 2004 representations were false when made and that Johnson would reasonably rely on the representations in making his decision to sign the Amendment.

Johnson alleges that the Defendants did not disclose to him numerous, material financial terms of the Bridge Loan, including, without limitation, the restrictive financial covenants in it. He also alleges the Defendants did not disclose to him any of the risks of the Bridge Loan, including the risk that the LLC did not have, and would not be able to obtain access to, cash or other financing sufficient to service the Bridge Loan or pay the Distribution.

Johnson further alleges that the Defendants did not disclose that the terms of the Bridge Loan effectively rendered void his ability to withdraw from the LLC. One of the "'exit strategies'" claimed by the LLC, Mason and Carr was a put right (the "Put

10

Right") contained in the Operating Agreement. The Put Right allowed each member of the LLC, within one year of the date of contribution of his or her Catalog Interest, to put his or her Class A and Class C membership interests to the LLC. Upon the exercise of the Put Right and making the required payment, the member would receive his or her Catalog Interest from the LLC free and clear of any security interest or ownership, revenue or administration rights held by the LLC. Johnson alleges Fortress knew or should have known of the Put Right through its due diligence review of the Transactional Documents in connection with issuance of the Bridge Loan. The documentation for the Bridge Loan did not provide for such a release of the purported security interest in Johnson's Catalog Interest, thereby rendering his Put Right illusory. Johnson alleges he relied on Defendants' knowingly false representations that he could exercise the Put Right, withdraw from the LLC, and retain his Catalog Interest.

Johnson alleges that, from the date of his investment, the LLC experienced significant and material administrative and management difficulties and demonstrated a fundamental lack of publishing and administrative competence and experience. For instance, Defendants demanded payment of royalties on Johnson's EMI Catalog Interest despite EMI's refusal to allow Johnson's conveyance of his Catalog Interest to the LLC pursuant to EMI's right of first refusal and matching right. In spite of this, the Defendants knowingly pledged Johnson's EMI Catalog Interest as collateral for the Bridge Loan with the knowledge that they had no right to do so. The LLC also

11

failed to perform due diligence with respect to other members' catalogs and amounts payable thereunder, lost sensitive financial information, sent inadequate and ineffective letters of direction, and otherwise failed to take steps necessary to ensure that the LLC had adequate capital to service the Bridge Loan. Johnson alleges the LLC, Mason and Carr knew of these material problems before he executed the Transactional Documents, but they did not disclose their lack of competence and experience to him.

Johnson alleges the LLC was severely mismanaged by Mason, Carr and other employees who were represented to be "'music and financial industry professionals.'" (Id. at ¶ 34.) The LLC opened and staffed large offices in Nashville and Los Angeles and paid Mason, Carr and others excessive salaries while still operating under the Bridge Loan. The LLC also failed to perform sufficient due diligence with respect to the Catalog Interests it obtained, many of which required payment of outstanding liens and advances. To induce Johnson's continued membership, the Defendants repeatedly represented to Johnson that the Distribution and other amounts would be paid.

In or about November 2004, Fortress threatened to foreclose on the Bridge Loan and to take possession of Johnson's Catalog Interest. Among the reasons for the foreclosure was the LLC's inability to collect all royalty income owed to it and to direct such income toward the payment of the Bridge Loan. Shortly thereafter, Mason, Carr and several other key members of the LLC's senior management left the LLC. These were the same "music and

12

financial industry professionals" that the LLC, Carr and Mason lauded in the Transactional Documents and on whose leadership Johnson relied in purchasing his Class A and Class C membership interests.

In January 2005, Fortress sent a Notice of Acceleration relating to the Bridge Loan. Thus, Fortress is currently in a position to foreclose on the Bridge Loan and take possession of Johnson's Catalog Interest. Pursuant to the terms of the Operating Agreement, Johnson cannot withdraw as an investor in the LLC because his Put Right is ineffective and illusory under the terms of the Bridge Loan. Moreover, Johnson's Put Right purported to terminate on March 1, 2005, even though the LLC had yet to pay the Distribution as required under the Operating Agreement and as promised by the LLC, Mason and Carr. Johnson alleges, however, that he contributed his Catalog Interest to the LLC in reliance on, among other things, Defendants' false representations that he would have "multiple exit strategies," would receive his Distribution, and could retain his Catalog Interest upon withdrawal.[3]

---

[3]Johnson alleges that paragraph 13.12 of the Operating Agreement is an arbitration clause, which states in part that "'all disputes among the parties arising out of or relating to [the Operating Agreement] shall be resolved by final and pending arbitration[.]'" (Complaint at ¶ 37.) Johnson alleges the arbitration clause does not apply to his claims for relief because none of the claims arise out of or relate to the Operating Agreement. Rather, he alleges his claims are based upon misstatements and omissions of material fact that Defendants made to induce him to purchase membership interests in the LLC and contribute his Catalog Interest to the LLC. Defendants' Motions to Dismiss do not address the arbitration clause, except to say Defendants reserve their right to compel arbitration.

13

Johnson brings eight (8) causes of action. In Count I, he requests a declaratory judgment against all Defendants except D'Loren pursuant to Tennessee Code Annotated §§ 29-14-102 *et seq.* and Tennessee Rule of Civil Procedure 57 that: (a) he did not receive any consideration for contributing his Catalog Interest pursuant to the terms of the Subscription Agreement and thus, the proposed contract between him and the LLC is null, void, and unenforceable for lack of consideration; (b) the Subscription Agreement was an offer to purchase Class A and C membership interests in the LLC, the LLC did not accept his offer and thus, Defendants have no right or interest in his catalog; (c) any purported transfer of his catalog is ineffective because EMI/Blackwood did not release its right of first refusal and matching right; (d) any alleged interest of the Defendants in his catalog is null and void (Johnson also requests an order cancelling any interest in or impediment to his catalog, including cancellation of any registration or interest in the Copyright Office records with reassignment of those interests to him); and (e) to require Defendants to notify all payors of monies with respect to his catalog that all such payments should be made exclusively to him.

Johnson also brings the following causes of action: for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants except Fortress (Count II); for violation of the Tennessee Securities Act of 1980, Tenn. Ann. Code § 48-2-101, *et*

14

*seq.*, against all Defendants except Fortress (Count III); for common law fraud and misrepresentation against all Defendants except Fortress (Count IV); for reformation and rescission against all Defendants except D'Loren (Count V); for unjust enrichment against all Defendants (Count VI); for negligence against Defendants the LLC, Mason and Carr (Count VII); and for breach of fiduciary duty against Defendants the LLC, Mason and Carr (Count VIII).

Johnson seeks restoration to the pre-contract status quo. In return for what he received from the LLC, which was nothing, he seeks the return of his Catalog Interest through rescission of the LLC Operating Agreement and Subscription Agreement, and rescission of any and all security agreements relating to his Catalog Interest, as well as all other agreements related to the Class A and Class C membership interests in the LLC and the contribution of his Catalog Interest to the LLC. He also requests equitable relief precluding the LLC, Carr and Mason from transferring his Catalog Interest to Fortress or any other party, whether by agreement or operation of law. He further seeks compensatory and punitive damages and costs and expenses, including attorney's fees.

Defendants Mason, Carr and the LLC move to dismiss Count II, the federal cause of action, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). If their motion to dismiss Count II is granted, they assert the remaining state-law claims should be dismissed for lack of jurisdiction. If their

motion to dismiss Count II is denied, they also seek dismissal of Count I and Counts III through VIII under Rule 12(b)(6).

Defendant D'Loren joins in the Motion to Dismiss filed by Defendants Mason, Carr and the LLC as to the claims in which he is named, which are Counts II, III, IV, and VI. Defendant Fortress moves to dismiss Counts I, V, and VI for failure to state a claim.

## II. STANDARD OF REVIEW

In evaluating Johnson's claims under Rule 12(b)(6), the Court must accept as true all of Johnson's allegations and resolve all doubts in his favor. See In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 547 (6th Cir. 1999). The Court should not dismiss the claims unless it appears beyond doubt that Johnson cannot prove any set of facts in support that would entitle him to relief. See id. In general, a claim must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). The issue before the Court is not whether Johnson may ultimately prevail on his claims, but whether he is entitled to offer evidence in support of his claims. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III. ANALYSIS

Because the Defendants named in Count II, the federal securities fraud claim, assert that all state-law claims against them must be dismissed for lack of jurisdiction if they prevail in achieving dismissal of the federal claim, the Court will begin its analysis with the federal securities fraud cause of action.

16

**A. Securities fraud claim (Count II)**

Section 10(b) of the Securities Exchange Act provides that it is unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The implementing regulation, Rule 10b-5, forbids, "in connection with the purchase or sale of any security[,]" the use of "any device, scheme, or artifice to defraud"; the making of "any untrue statement of a material fact" or the failure "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or engagement in any "act practice, or course of business" that "operates . . . as a fraud or deceit upon any person[.]" 17 C.F.R. § 240.10b-5 (2005). The scope of Rule 10b-5 is coextensive with the coverage of § 10(b). SEC v. Zandford, 535 U.S. 813, 816 n.1 (2002). The statute must be construed in a flexible manner to accomplish its remedial purposes, and the Securities Exchange Commission ("SEC") has "consistently adopted a broad reading of the phrase "'in connection with the purchase or sale of any security.'" Id. at 819. Conduct falls within the ambit of § 10(b) where the scheme to defraud coincides with the sale of securities. Id. at 822.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with

17

scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing the plaintiff injury. City of Monroe Employees Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 668 (6th Cir. 2005). See also Dura Pharmaceuticals, Inc. v. Broudo, — U.S. —, 125 S.Ct. 1627, 1631 (2005) (stating similar elements of claim involving publicly traded securities).

Before 1995, a plaintiff had to allege fraud "with particularity." Fed.R.Civ.P. 9(b). In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 & 78u-5 (the "PSLRA"), and heightened the pleading standard for securities fraud cases in which money damages are sought. In any private securities fraud action like this one "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Explaining the meaning of "strong inference," the Sixth Circuit wrote:

> Inferences must be reasonable and strong--but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how

18

closely a conclusion of misconduct follows from a
plaintiff's proposition of fact.  Plaintiffs need not
foreclose all other characterizations of fact, as the
task of weighing contrary accounts is reserved for the
fact finder.  Rather, the "strong inference" requirement
means that plaintiffs are entitled only to the most
plausible of competing inferences."

Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001) (en banc).

Prior to 1995, many courts, including the Supreme Court,
considered "scienter" to involve "a mental state embracing intent
to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder,
425 U.S. 185, 193 n.12 (1976).  The Sixth Circuit recognized that,
for statements of present or historical fact, recklessness can also
constitute sufficient scienter to impose liability under § 10(b),
and the PSLRA did not change this standard.  Helwig, 251 F.3d at
550-552;  In re Comshare, 183 F.3d at 550; Mansbach v. Prescott,
Ball & Turben, 598 F.2d 1017, 1024 (6th Cir. 1979).

Recklessness is defined as "highly unreasonable conduct which
is an extreme departure from the standards of ordinary care.  While
the danger need not be known, it must at least be so obvious that
any reasonable man would have known of it." Mansbach, 598 F.2d at
1025.  It is "a mental state apart from negligence and akin to
conscious disregard." In re Comshare, 183 F.3d at 550.  See also
Fidel v. Farley, 392 F.3d 220, 227 (6th Cir. 2005).  Thus, it is not
sufficient for a plaintiff to plead merely motive and opportunity
to defraud.  In re Comshare, 183 F.3d at 551.  "While facts
regarding motive and opportunity may be 'relevant to pleading
circumstances from which a strong inference of fraudulent scienter
may be inferred,' [citation omitted] and may, on occasion, rise to

19

the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter." Id. The Court must consider the totality of the circumstances to determine whether the facts alleged collectively give rise to a strong inference of at least recklessness. Bridgestone Corp., 399 F.3d at 683; PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 683 (6th Cir. 2004).

Thus, Johnson may survive the motions to dismiss by meeting the PSLRA's pleading requirements through allegations of "facts that give rise to a strong inference of reckless behavior[.]" Id. He is not required to "allege facts giving rise to a strong inference of knowing misrepresentation or intent to survive motions to dismiss." Id. at 552.

An allegedly false statement must be misleading as to a material fact; it is not enough if the statement is false or incomplete if the misrepresented fact is not otherwise significant. Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988). "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Id. at 240. This is a fact-intensive test that must be applied to the allegations. Helwig, 215 F.3d at 555. In the case of omitted material facts, the element of the Plaintiff's reliance may be presumed. Rubin v. Schottenstein, 143 F.3d 263, 268 (6th Cir. 1998) (en banc). "'All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

20

important in the making of his decision.'" <u>Id.</u> (quoting <u>Affiliated</u>
<u>Ute Citizens v. United States</u>, 406 U.S. 128, 153-154 (1972)).

*1. Closing of the Loan and payment of the Distribution*

Applying these standards, the Court concludes that Johnson has
met the heightened burden under the PSLRA to plead the misleading
nature of material statements made by Mason, Carr, D'Loren and the
LLC concerning the LLC's desire to obtain Johnson's Catalog
Interest, the intent to obtain a Loan and a Bridge Loan, the intent
to make the Distribution discussed in the Operating Agreement, and
the intent to make the partial ten percent (10%) Distribution upon
closing of the Bridge Loan.

The Complaint contains specific allegations that, during the
period between November 2003 and February 2004, Defendants the LLC,
Mason and Carr made numerous and repeated representations to
Johnson, which they knew were false or were likely to be false, in
an effort to persuade him to join the LLC. It is alleged that
Defendant Mason misrepresented to Johnson that he would realize a
substantial annual writer's draw from the LLC. Further, Defendants
Mason and Carr misrepresented to Johnson that he would receive a
Distribution based upon Class A membership interests and, before he
executed the Subscription Agreement and the Operating Agreement on
December 12, 2003, they told him the Loan would close in January or
February of 2004. It is also alleged that Defendant Mason
misrepresented to Johnson that the Loan and the Bridge Loan would
be subject to an extremely favorable interest rate, but she failed

21

to disclose to Johnson the terms, restrictive covenants, risks, and high interest rate of the Bridge Loan.

Johnson alleges that Defendant Carr misrepresented to him that the only way he would lose money by joining the LLC would be in the case of a total collapse of the world's economy. Moreover, Defendants Mason and Carr did not inform Johnson that certain songwriters, such as Annie Roboff, were being promised large consulting fees to limit their personal risk in the event the LLC defaulted on the Loan or the Bridge Loan.

When the Loan had not closed by the end of February, the LLC, Mason and Carr continued to advise Johnson that the closing was "imminent" in order to induce him not to withdraw his subscription. Johnson further alleges that, at the time the Defendants made the statements, they knew, but did not disclose to him or to his agents, that no financial institution had agreed to enter into the Loan with the LLC, even though they had a duty to disclose the information. See Rubin, 143 F.3d at 268 (observing that one who discloses material facts in connection with securities transaction assumes duty to speak fully and truthfully on subject).

A strong inference of actual intent and/or recklessness may be drawn from the failure of the LLC, Mason and Carr to provide Johnson with a private placement memorandum and thereby disclose numerous material risks he faced in pledging his Catalog Interest as collateral for the Loan or the Bridge Loan. Any statements or omissions these Defendants made on behalf of the LLC between November 2003 and March 2004, when the Bridge Loan closed, were made

22

in connection with the sale of securities. See Zanford, 535 U.S. at 822.

Additionally, Johnson alleges that the LLC required him to sign an Amendment to the Operating Agreement. He asserts that the LLC, through its agents, Chuck McNeal and Tom McHugh, told him he had to execute the Amendment in order to receive proceeds from the Bridge Loan, yet Defendants the LLC, Mason, Carr and D'Loren did not disclose to him the risks inherent in the Bridge Loan, including the restrictive financial covenants in it.

On February 12, 2004, Johnson asked McNeal and McHugh to quantify the financial risk he faced if he signed the Amendment, contributed his Catalog Interest as collateral for the Bridge Loan and received a payment of ten percent (10%) of his expected Distribution. McNeal and McHugh told him that his exposure was approximately $70,000 to $80,000 in the event of default. Johnson refused to sign the Amendment. The next day, however, upon learning that Johnson did not intend to execute the Amendment, and needing Johnson's Catalog Interest to secure the Bridge Loan, the LLC, Mason, and D'Loren represented in writing to Johnson that he would receive $53,886.90 at closing of the Bridge Loan in return for the pledge of his Catalog Interest as collateral for the Bridge Loan. They also represented that the risk attributable to him in the event of a default on the Bridge Loan would be 1.9%, and the amount he stood to lose, above the Distribution, for default on the Bridge Loan was $8,000, not the $80,000 he had previously been told. In fact, Johnson's liability on the Bridge Loan was $80,000, not

23

$8,000.  Johnson alleges the Defendants knew the representations they made on February 13, 2004, were false when they made them and they knew he would reasonably rely on those representations in deciding to sign the Amendment.  Although the Defendants pledged Johnson's Catalog Interest as collateral for the Bridge Loan from Fortress, Johnson did not receive any money, nor did he receive the Class A or Class C membership interests promised pursuant to the Subscription Agreement.

These specific allegations "state with particularity facts giving rise to a strong inference that [Defendants Mason, Carr, D'Loren and the LLC] acted with the required state of mind[]" in making material representations and failing to disclose information to Johnson, upon which he relied in making his decision to join and remain in the LLC.[4]  15 U.S.C. § 78u-4(b)(2).  Although some of the

---

[4]Although Defendants contend the Subscription Agreement included a merger and integration clause, Johnson notes courts have rejected the argument that such a clause necessarily precludes reliance, AES Corp. v. The Dow Chemical Co., 325 F.3d 174, 181 (3rd Cir. 2003); Rogen v. Ilikon Corp., 361 F.2d 260, 267-268 (1st Cir. 1966), and contends he was not a sophisticated investor accustomed to undertaking financial due diligence. Cf. Harsco Corp. v. Segui, 91 F.3d 337, 345-347 (2nd Cir. 1996).  Defendants note Johnson agreed in the Subscription Agreement that he was a sophisticated "accredited investor" and he assumed the "very significant risks" associated with his investment.

As in AES Corp., 325 F.3d at 182, Johnson "may have an uphill battle here and summary judgment for the defendants may be appropriate at some point," but the Court declines "to give controlling significance to the existence of a non-reliance clause in a vacuum. . . . [T]o hold that a buyer is barred from relief under Rule 10b-5 solely by virtue of his contractual commitment not to rely would be fundamentally inconsistent with Section 29(a)[,]" 15 U.S.C. § 78cc(a) (rendering unenforceable any contractual provision in which a party agrees to waive compliance with the Securities Exchange Act).

24

statements promising to obtain the Loan are forward-looking, they are evidence of Defendants' scienter. The statements indicate Defendants either did not intend to obtain the Loan as promised in the Transactional Documents given to Johnson in late 2003, or that Defendants acted recklessly in failing to meet the present promises to obtain the Loan and pay the Distribution that induced Johnson to offer to purchase membership shares in the LLC. Consequently, the Court concludes that Johnson states a securities fraud claim against the LLC, Mason, Carr and D'Loren under § 10(b) and Rule 10b-5 concerning closing the Loan and Bridge Loan and paying the Distribution or partial Distribution.

    *2. The Put Right*

    Johnson alleges, and the Handbook provided to him by the LLC confirms, that Defendants Mason, Carr and the LLC represented Johnson would have the right to withdraw from the LLC during the first year on thirty days' written notice. The Handbook stated:

> Withdrawing Members will be entitled to a full reversion of their catalogs, including the compositions originally contributed upon joining the Collective and the compositions subsequently created under the Exclusive Songwriter Agreement; however:
> - Withdrawing Members will be responsible for repaying 120% of the remaining unamortized balance of their allocable shares of the Debt, plus unpaid accrued interest and any applicable Debt prepayment penalties and yield maintenance premiums.

(Docket Entry No. 45-1 at Appx. 13.) Additionally, Defendants represented that Johnson would have "multiple exit strategies." Johnson emphasizes these representations were material to him, that

25

he relied on the representations, and that the representations influenced his decision to join the LLC.

Johnson further alleges the Defendants failed to disclose to him that the Put Right became illusory under the terms of the LLC's March 2004 Bridge Loan Agreement with Fortress, which included the following clause: "Voluntary Withdrawal. The Borrower shall not permit any Member to voluntarily withdraw from the LLC Agreement." (Docket Entry No. 53-2 at 43.) In Section 9.01 of the Bridge Loan Agreement, the LLC further agreed with Fortress that the LLC's failure to comply with "any other covenant, agreement or provision contained in this Agreement or any other Loan Document on its part to be performed," if unremedied for a period of fifteen days, "shall constitute an 'Event of Default.'" (Id.)

Johnson alleges that the LLC, Mason and Carr knew the terms upon which Fortress agreed to make the Bridge Loan and that the Defendants knew the provisions of the Bridge Loan Agreement obviated his Put Right, but Defendants did not disclose these facts to him. This information was material to Johnson in that it affected his ability to withdraw from the LLC. See Rubin, 143 F.3d at 268.

Johnson's allegations state with particularity facts giving rise to a strong inference that Defendants acted with the required scienter. See 15 U.S.C. § 78u-4(b)(2). Moreover, Defendants' failure to disclose to Johnson that the Put Right became illusory as a result of the signing of the Bridge Loan Agreement with Fortress on March 1, 2004, was material information, and the failure to disclose was in connection with the sale of securities. Zanford,

26

535 U.S. at 822. Accordingly, Johnson states a securities fraud claim against the Defendants LLC, Mason, and Carr under § 10(b) and Rule 10b-5 concerning the loss of his Put Right to effectuate reversion of his Catalog Interest upon compliance with the terms of his Agreements with the LLC.

### 3. Other allegations

The Court agrees with Defendants that other alleged representations are not sufficiently specific to meet the requirements of § 78u-4(b)(2) and thus, they are not, in and of themselves, actionable, although the Court notes such allegations may provide background support for the actionable representations or omissions. Non-actionable statements are that members would have the "ability to monetize" their catalogs and convert "royalties into cash flow," that the LLC would offer "transparency in all financial reporting," that the LLC had "brought together a highly regarded team of music and financial industry professionals," and that the LLC had identified "an experienced team of executives to run the creative, licensing and creative sides of the business." Johnson has not alleged how these statements were false or misleading or why they should not be viewed as "soft, puffing statements" or sales talk" lacking materiality. <u>See</u> <u>Helwig</u> 251 F.3d at 555.

### 4. Loss causation

As to the closing of the Loan, payment of the Distribution, and loss of the Put Right, Johnson has adequately alleged loss causation. <u>See</u> 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of

27

proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.") Johnson need only provide the Defendants with "fair notice of what [his] claim is and the grounds upon which it rests." Broudo, — U.S. —, 125 S.Ct. at 1634. Johnson's pleading on causation is adequate if he provides Defendants "with some indication of the loss and the causal connection" that he has in mind. Id.

Here, Johnson alleged more than a belief that Defendants' conduct damaged him. He specifically alleges that he has been damaged by the LLC's failure to administer properly his Catalog Interest, by his inability to withdraw his Catalog Interest from the LLC because of the terms of the Bridge Loan, by the copyright mortgages Fortress took in his Catalog Interest, and by Fortress's impending foreclosure on the Bridge Loan, which will permit Fortress to take ownership and control of his Catalog Interest. Johnson has alleged sufficient loss causation to survive the Motions to Dismiss.[5]

## B. Tennessee Securities Act and common law fraud claims (Counts III and IV)

Defendants the LLC, Mason, Carr, and D'Loren next contend that Johnson's claims brought under the Tennessee Securities Act of 1980, Tenn. Code Ann. §§ 48-2-121, 48-2-122(c), and the Tennessee common

-----

[5]Because the Court concludes that Johnson has stated a federal claim under § 10b, the Court will not address the suggestion of Defendants that the remaining state-law counts should be dismissed for lack of jurisdiction.

28

law of fraud (Counts III and IV) should be dismissed for the same reasons Johnson fails to state a federal securities claim under section 10(b) in Count II. Defendants suggest the elements of the Tennessee securities and common law fraud claims are the same as the federal securities fraud claim, with the exception that Johnson must allege actual intent, not recklessness, to prevail under Tennessee law on securities fraud. See Ockerman v. May Zima & Co., 27 F.3d 1151, 1155-1156 (6th Cir. 1994); Constantine v. Miller Indus., Inc., 33 S.W.3d 809, 813 (Tenn. Ct. App. 2000) (observing Tennessee securities law closely follows federal Rule 10b-5); Dobbs v. Guenther, 846 S.W.2d 270, 274 (Tenn. Ct. App. 1992).

Because the Court previously concluded that Johnson adequately pleaded a federal securities fraud claim applying both the actual intent and recklessness standards, the Court likewise concludes that Johnson may proceed on his claim under the Tennessee Securities Act (Count III) and on his claim for common law fraud (Count IV).

## C. Rescission (Count V)[6]

Defendants Mason, Carr, and the LLC next assert, relying on Delaware law, that Johnson's Count V for rescission against them must be dismissed because Johnson has not adequately pleaded the existence of fraud that would entitle him to rescission, and even if he has, rescission is not the proper remedy where Johnson has not alleged how the parties can be returned to the status quo and where

---

[6]Although Johnson uses the label "reformation and rescission," he does not contend that any contract is subject to reformation. All of the parties' arguments concern rescission.

he has failed to exhaust other remedies, such as damages. Defendants further contend Johnson lacks standing to seek rescission of any agreements to which he was not a party. Thus, Johnson may not obtain rescission of the agreements between the LLC and Fortress concerning the Bridge Loan or of any other "security agreements" or "other agreements" to which Johnson was not a party.

Defendant Fortress contends, relying on New York law, that Johnson's claim fails because rescission of the agreements which pledged the Catalog Interest to the LLC and provided Fortress a security interest in the Catalog Interest would not place the parties back in status quo; Fortress would be prejudiced by rescission of any of the agreements insofar as such rescission would interfere with Fortress' security interest without return of the $12 million Bridge Loan to the LLC; Fortress is not a party to the agreements between Johnson and the LLC; and Johnson lacks standing to rescind Fortress' agreement with the LLC.

Johnson alleges that Fortress knew about the LLC's fraudulent conduct and therefore, Fortress is not entitled to the protections afforded to a good faith, intervening purchaser who takes a security interest in collateral without notice that the debtor obtained the collateral through fraud. Johnson confirms that he seeks to rescind only those agreements to which he was a party, the Subscription and Operating Agreements with the LLC. Upon rescission of those agreements, however, Johnson asserts the LLC will lose any purported rights in his Catalog Interest and therefore, upon rescission, Johnson asks the Court to declare invalid and void any security

30

interest and/or liens asserted by Fortress related to the Bridge Loan Agreement. <u>See</u> Tenn. Code Ann. § 47-9-203.

Further, Johnson asserts he has alleged how he can be returned to the status quo: he will regain possession of his Catalog Interest and the LLC will receive in return all that it gave him, which is nothing, since he did not receive any money or Class A or Class C membership shares. Johnson contends that money damages would be an inadequate remedy in this case because he stands to lose his Catalog Interest if Fortress is permitted to foreclose.

The Court concludes that Johnson has adequately pleaded a basis for rescission of the Subscription and Operating Agreements due to alleged fraud no matter which state's law is applied, and that Johnson survives the Rule 12(b)(6) dismissal motion and may proceed to discovery. Taking the facts alleged by Johnson as true, as the Court must do, the Court cannot hold as a matter of law that Fortress qualifies as a good faith third-party purchaser because Johnson alleges Fortress knew of the LLC's fraudulent conduct and participated in it by taking security interests in his music compositions. Thus, until the facts are illuminated further in discovery, the Court cannot rule on Fortress's possible status as a good faith purchaser.

**D. Unjust enrichment (Count VI)**

A court may imply a contract where a contract does not exist between the parties on the subject matter or such a contract has become unenforceable or invalid and where the defendant will be unjustly enriched absent imposition of the quasi-contractual

obligation.  See Whitehaven Community Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998); Swafford v. Harris, 967 S.W.2d 319, 324 (Tenn. 1998).  Defendants contend that, because Johnson acknowledged in his agreements with the LLC that he received "good and valuable consideration" for entering into those agreements and for contributing his Catalog Interest to the LLC, he fails to state a claim for unjust enrichment.  Moreover, they suggest Johnson has not exhausted his contract damages remedy.

Johnson will be permitted to proceed on his unjust enrichment claim (Count VI) at this stage of the litigation.[7]  If he ultimately can prove that he was induced by fraud into signing the Subscription and Operating Agreements and transferring his Catalog Interest to the LLC in exchange for no money and no membership shares, then he may be able to recover against Defendants on the unjust enrichment theory.  Thus, the Court will not dismiss Count VI at this time.

## E.  Negligence and Breach of Fiduciary Duty (Counts VII & VIII)

Johnson alleges that the managers of the LLC, including Mason and Carr, had a duty, among other things, to operate the LLC in the best interests of the LLC and its members, to deal with its members in good faith, and to give members true and correct information concerning the LLC, its operations and its viability.  Johnson alleges that Defendants breached their duty, and as a result he sustained damages.

---

[7]Johnson does not oppose Fortress's motion to dismiss the unjust enrichment claim against it, and therefore, Fortress' Motion to Dismiss Count VI will be granted.

Johnson identifies the source of Defendants' duty as the standard of conduct imposed on managers of a limited liability company, Tenn. Code Ann. § 48-241-111, or alternatively, the standard of conduct imposed in the Operating Agreement itself. Johnson contends the exculpation clause in the Operating Agreement at issue in this case does not apply to his negligence claim against the Defendant officers of the LLC because the clause expressly does not cover "any transaction for which the . . . Officer receives a personal benefit in violation or breach of any provision of this Agreement, the Certificate of Formation of the Company or the Delaware Act."  (Docket Entry No. 45-5, Operating Agreement at ¶ 7.5.)

Defendants contend Johnson's proper remedy for alleged improper performance or failure to perform under an existing contract remains in contract, regardless of whether the alleged breach of contract was intentionally or unintentionally caused by negligence in attempting performance, citing Oak Ridge Precision Indus., Inc. v. First Tennessee Bank Nat'l Assoc., 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992), and Harvest Corp. v. Ernst & Whinney, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980).

The two cases cited by Defendants do not preclude Johnson from proceeding on a negligence theory under the facts of this case. Neither case cited involved a suit by a member of a limited liability company against a manager or officer of the company under § 48-241-111 or a specific operating agreement.  In Oak Ridge Precision Indus., Inc., the Court of Appeals considered a suit by

33

a corporation against a lender for various tort claims, including negligence, for failing to loan a certain sum of money. The court ruled there was not a contract in existence between the parties which imposed a duty on the lender to make such a loan. 835 S.W.2d at 30. Accordingly, the court observed that any independent tort claim must necessarily fail because the "claim must be grounded in the bad faith refusal of a party to comply with an agreement which establishes its duties." Id. Because there was no agreement, there was no duty which had been breached. Id.

Harvest Corp. involved the interplay between the three- and six-year statutes of limitations in Tennessee. In determining which limitations statute applied, the court looked to the kind of damages sought "regardless of whether the cause of action sounds in tort or contract." 610 S.W.2d at 729. Accord Keller v. Colgems-EMI Music, Inc., 924 S.W.2d 357, 360-361 (Tenn. Ct. App. 1996) (holding three-years statute applied to damages claim arising from allegations of fraud and breach of fiduciary duty).

Here, Johnson seeks damages in negligence against managers of the LLC for breach of the standard of "care an ordinarily prudent person in a like position would exercise under similar circumstances." Tenn. Code. Ann. § 48-241-111. This is a classic negligence standard with its source in a state statute squarely applicable to this case. Because Johnson has alleged sufficient facts to support the necessary elements of duty, breach of duty, damages, and proximate cause, Defendants' Motions to Dismiss for

34

failure to state a claim will be denied and Johnson will be permitted to proceed on his negligence theory.

The same statute provides that managers of a limited liability company "shall discharge the duties of an office in good faith, in a manner the manager reasonably believes to be in the best interests of the LLC[.]" Tenn. Code. Ann. § 48-241-111. Although Johnson relies on <u>Knox-Tenn Rental Co. v. Jenkins Ins., Inc.</u>, 755 S.W.2d 33, 36 (Tenn. 1988), as authority for the existence of a fiduciary duty, Johnson acknowledges that case pertains to the fiduciary duty of the officers and directors of a corporation to the corporation and its members. In similar fashion, however, the Tennessee Court of Appeals has at least implicitly recognized that the manager of a limited liability company bears a fiduciary duty to the limited liability company and its members. <u>ARC Lifemed, Inc. v. AMC-Tennessee, Inc.</u>, — S.W.3d —, 2005 WL 1819210 at *17-18 (Tenn. Ct. App. Aug. 2, 2005); <u>Shell v. King</u>, 2004 WL 1749186 at *3-*5 (Tenn. Ct. App. Aug. 5, 2004) (unpublished). Also, Defendants do not dispute that, under Delaware law, a manager or director has a fiduciary duty to act in good faith. (Docket Entry No. 44, Memorandum at 24.) Because Johnson has alleged sufficient facts to support a claim for breach of fiduciary duty under either Tennessee or Delaware law, the Court will deny Defendants' Motions to Dismiss Count VIII.

**F. Declaratory Judgment (Count I)**

Johnson seeks a declaration, among other things, that he did not receive any consideration for contributing his Catalog Interest

35

pursuant to the terms of the Subscription Agreement and thus, the proposed contract between him and the LLC is null, void, and unenforceable for lack of consideration; the Subscription Agreement was his offer to purchase Class A and C membership interests in the LLC, the LLC did not accept his offer and thus, Defendants have no right or interest in his catalog; and any purported transfer of his catalog is ineffective because EMI/Blackwood did not release its right of first refusal and matching right.

Defendants the LLC, Mason, Carr and D'Loren contend Johnson's allegation that the Subscription Agreement is null and void for lack of consideration is contradicted by the terms of the Agreement itself, which Plaintiff admits he signed and which Defendant Mason signed on behalf of the LLC. The Subscription Agreement provides in pertinent part: "In consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows[.]" (Docket Entry No. 45-9 at 89.) Furthermore, these Defendants contend that Mason accepted Johnson's offer to purchase membership shares, forming a contract supported by consideration, when she signed the Subscription Agreement below the attestation "ACCEPTED AND ACKNOWLEDGED." (Id. at 97.) Johnson responds that the recital is contradicted by other language in the Subscription Agreement which expressly contemplates that Johnson would receive his consideration as of the closing of the Loan, not the date of execution of the Subscription Agreement.

As Johnson correctly points out, the recital in the

Subscription Agreement does not preclude the introduction of parol evidence to contradict or explain the written acknowledgment of consideration. Buhl v. Vradenburg, 1986 Tenn. App. LEXIS 2859 at *6-8 (Tenn. Ct. App. Mar. 12, 1986). Because Johnson pled that he did not receive any consideration in return for pledging his Catalog Interest to the LLC, dismissal on the claim for lack of consideration is not warranted. Furthermore, an ultimate finding that Johnson can prove his agreements with the LLC, Mason and Carr were void for lack of consideration would eclipse Defendant Fortress' argument that the contracts are merely voidable for alleged fraud. Whether Johnson may ultimately obtain a declaration that any contract is unenforceable and/or void is a question best left for another day after the parties have had an opportunity to conduct discovery and to present a full record.

Defendants also contend that Johnson lacks standing to allege the rights of EMI/Blackwood in his Catalog Interest and that it would be inequitable to grant Johnson the declaration he seeks because he transferred rights in a catalog that actually belonged to EMI/Blackwood and which he had no right to transfer.

Johnson alleges that he had transferred and assigned his music catalog "in part" to EMI/Blackwood. (Complaint ¶ 10.) The Subscription Agreement expressly stated that Johnson would pledge his Catalog Interest to the LLC "subject to any other publishing arrangements, mortgages, liens, charges, pledges, security interests, encumbrances, or other claims whatsoever previously disclosed to the Company, all as of the Closing Date." (Docket

37

Entry No. 45, Subscription Agreement at ¶ 1.1.) The LLC and Fortress knew that the LLC needed to obtain a waiver from EMI/Blackwood because such a requirement was specifically included in the Loan Agreement between the LLC and Fortress. (Docket Entry No. 53 at SVIII-1.) Taking all of these facts as true, the Court concludes that Johnson has standing to assert his own interest in and to his own music catalog against Defendants, even though EMI/Blackwood may also have standing to assert rights in the catalog. See Warth v. Seldin, 422 U.S. 490, 499 (1975) ("this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.")

Defendant Fortress contends that Johnson is not entitled to the declaratory judgment he seeks because Fortress is an innocent, intervening third party with a secured interest in Johnson's music catalog. Johnson has pled, however, that Fortress knew about the alleged fraud of the other named Defendants or should have known of the alleged fraud through the due diligence Fortress purportedly performed in advance of making the Bridge Loan to the LLC. As the Court stated earlier, whether Fortress is an intervening innocent third-party purchaser for value is a fact question that must be examined at the conclusion of discovery. Taking the alleged facts as true for purposes of the Motion to Dismiss, the Court must conclude that Johnson has stated a claim for declaratory judgment.

Defendant Fortress also contends it is a secured party under Article 9 of the Tennessee Commercial Code. See Tenn. Code Ann. §

38

47-9-203. The parties do not appear to dispute that Fortress gave value to the LLC in the amount of more than $12 million and that the LLC, as debtor, authenticated a security agreement in favor of Fortress. Id. At issue, however, is whether the LLC, as debtor, had rights in the collateral or the power to transfer rights in the collateral to Fortress. Id. Fortress claims that, even if Johnson's contracts with the LLC are voidable for alleged fraud, one with voidable title still has power to transfer a security interest in the collateral to a secured party. If Johnson is ultimately successful in proving that his agreements with the LLC were void from the inception and the LLC did not possess any rights in his Catalog Interest that could be transferred to Fortress as security for the Bridge Loan, however, then Fortress would not be a secured creditor under Article 9 because the LLC would not have possessed even voidable title that it could transfer to Fortress. Accordingly, Johnson will be allowed to proceed on his claim for declaratory judgment in Count I and the Motions to Dismiss that count will be denied.

## IV. CONCLUSION

For all of these reasons, the Motion to Dismiss on Behalf of Defendants The Songwriter Collective, LLC, E. Jean Mason and Budd Carr (Docket Entry No. 43) will be DENIED. The Motion To Dismiss On Behalf Of Defendant Robert D'Loren (Docket Entry No. 63) will also be DENIED.

The Motion to Dismiss On Behalf of Defendant Fortress Credit Opportunities I, LP (Docket Entry No. 33) will be GRANTED IN PART

39

AND DENIED IN PART. Because Johnson does not oppose dismissal of Count VI against Defendant Fortress for unjust enrichment, the Motion will be GRANTED and Count VI will be DISMISSED WITH PREJUDICE. The Motion to Dismiss will be DENIED in all other respects.

An appropriate Order will be entered.


ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE