UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TIM JOHNSON, | ) |
|     Plaintiff, | ) |
| v. | ) |
| THE SONGWRITER COLLECTIVE, LLC, E. JEAN MASON, BUDD CARR, ROBERT D'LOREN and FORTRESS CREDIT OPPORTUNITIES I LP, | ) |
|     Defendants. | ) |
| THE SONGWRITER COLLECTIVE, LLC, | ) No. 3:05-0320 |
| | ) JUDGE ECHOLS |
|     Cross-Claimant, | ) |
| v. | ) |
| ROBERT D'LOREN, | ) |
|     Cross-Defendant. | ) |
| THE SONGWRITER COLLECTIVE, LLC, | ) |
|     Third Party Plaintiff, | ) |
| v. | ) |
| ANNIE ROBOFF and UCC CAPITAL CORP., | ) |
|     Third Party Defendants. | ) |

MEMORANDUM

Pending before the Court is the portion of the Motion of Third-Party Defendant Annie Roboff to Dismiss and for Certain Alternate Relief (Docket Entry No. 100) that has not been withdrawn by her (Docket Entry No. 112). Third-Party Plaintiff, The

1

Songwriter Collective, LLC ("TSC") responded in opposition to the motion.

## I.  FACTS AND PROCEDURAL HISTORY

Songwriter Tim Johnson brought this suit against TSC, E. Jean Mason, Budd Carr, Robert De'Loren, and Fortress Credit Opportunities I LP ("Fortress") alleging eight causes of action, including violations of federal and Tennessee securities laws, fraud and misrepresentation, reformation and rescission, unjust enrichment, negligence, breach of fiduciary duty and declaratory judgment.  The Court previously denied Motions to Dismiss with the limited exception that the Court dismissed an unjust enrichment claim against Fortress.

Following the Court's ruling, TSC answered the Amended Complaint and filed a Cross-Claim against Robert D'Loren and a Third-Party Complaint against Annie Roboff ("Roboff") and UCC Capital Corp. ("UCC").  Presently at issue are counts for breach of contract and indemnity TSC has alleged against Roboff in the first and second claims of the Third-Party Complaint.

TSC is a limited liability company organized under Delaware law with its principal place of business in Tennessee.  Defendant E. Jean Mason ("Mason") served as Chief Operating Officer of TSC.  Defendant Budd Carr ("Carr") served as Chief Executive and Chief Creative Officer of TSC.  Mason and Carr are citizens of California.  Defendant Fortress is a limited partnership organized under Delaware law with its principal place of business in New

2

York. Roboff, a citizen of Tennessee, is a musician and songwriter who does business as ANWA Music.

TSC's Third-Party Complaint alleges that in the Fall of 2002, Mason approached Roboff and other songwriters to discuss a new business venture, TSC, which would represent an alternative to traditional music publishing companies. Mason envisioned that TSC would be jointly owned by a group of songwriters, and each songwriter-member would assign his or her respective music catalog to the company. In return, each songwriter would receive a share of the equity in TSC and participate in revenues derived from TSC. The company would administer the music catalogs and collect royalty revenues. (Docket Entry No. 114-2 ¶¶ 115-116.)

In September 2002, Mason approached SESAC, a major performing rights society, about the possibility of SESAC serving as administrator of TSC's catalogs and providing an initial bridge loan in order to give TSC working capital while it tried to obtain more permanent financing. TSC intended to raise the money it needed for permanent financing through a securitization of the future revenue streams to be derived from the songwriter-members' catalogs. (Id. ¶¶ 117-118.)

In March 2003, TSC and SESAC agreed that SESAC would provide the initial bridge loan, secured by pledge guarantees from songwriters who planned to become members of TSC. SESAC prepared the first draft of the loan agreement which provided for an initial loan in the amount of $1 million and a working capital operating loan in the amount of $2.3 million. (Id. ¶ 119.)

SESAC suggested that TSC employ the services of UCC to handle TSC's permanent securitization. Mason and a TSC consultant traveled to New York and met with UCC's president, D'Loren, who presented himself and his company as experts in the securitization of intellectual property assets. D'Loren represented to Mason that UCC could complete the securitization of the catalogs within 90 to 120 days through a fund provided to UCC by GE Capital. Shortly thereafter, TSC retained D'Loren as its agent and financing expert. (Id. ¶ 120.)

Sometime prior to the scheduled closing date of the SESAC loan, D'Loren instructed Mason to remove TSC's $2.3 million capital operating loan from the SESAC loan agreement because TSC could instead use the funds obtained from UCC's permanent securitization for TSC's operating budget. D'Loren also promised Mason that UCC could complete the securitization of TSC's catalogs within 90 to 120 days. Due to his expertise in financing and his role as TSC's agent, TSC valued and relied upon D'Loren's opinion. (Id. ¶ 121.)

On July 1, 2003, in reliance on D'Loren's representations, Mason, on behalf of TSC, signed the SESAC Master Agreement and loan documents, in which SESAC agreed to loan TSC $700,000 and SESAC's obligation to supply an additional $2.3 million capital operating loan was deleted. Pursuant to the terms of the agreement, the $700,000 loan was due on December 31, 2003. Roboff and another individual, Thom McHugh, pledged their catalogs as security for the SESAC loan. In exchange, Roboff received a promise of increased compensation should the planned securitization occur. Once the

4

SESAC loan closed, TSC began performing due diligence and valuation of the various music catalogs to be contributed to TSC by prospective songwriter-members. (Id. ¶¶ 122-123.) TSC opened a main office in Nashville and another office in Los Angeles.

At around the time of the signing of the SESAC Master Agreement, Roboff and her representatives began participating extensively in discussions about TSC's structure and in finding additional songwriters to become members of TSC. Roboff attended meetings in connection with the establishment of TSC and used her contacts in the music industry to promote TSC to prospective members. Roboff's advisors also participated in discussions regarding the language to be used in TSC's governing documents. (Id. ¶ 124.)

To become a member of TSC, a songwriter was required to sign "The Songwriter Collective, LLC Amended and Restated Limited Liability Agreement" and its amendments ("the Operating Agreement") as well as a subscription agreement concerning the purchase of membership interests in TSC ("the Subscription Agreement"). (Id. ¶ 125.) TSC included certain terms in these agreements in reliance on D'Loren's and UCC's repeated assurances that TSC would be able to complete its permanent securitization within 90 to 120 days and that TSC would have a sufficient operating budget thereafter. (Id. ¶ 126.)

On August 5, 2003, UCC and TSC executed an agreement ("the August 2003 Term Sheet") in which UCC agreed, among other things, that (a) it would use its best efforts to obtain income loans

5

secured by TSC's catalogs and music publishing revenues; (b) each loan would not be substantially in excess of seventy-five percent (75%) of the asset valuation of the collateral; (c) the minimum collateral required for each loan would be $20 million; (d) the maximum aggregate loan amount for the loans would be $100 million; (e) the closing date for the loans would be October 1, 2003; and (f) UCC would maintain confidentiality of all information it received relating to TSC and the transactions. (Id. ¶ 127.)

In December 2003, TSC was still completing its due diligence on the prospective songwriter-members' catalogs, and the SESAC loan was coming due on December 31, 2003, but permanent securitization had not occurred. D'Loren advised TSC to obtain a second bridge loan to pay off the SESAC loan and provide operating funds until TSC obtained the permanent securitization. D'Loren directed TSC to use a loan facilitator company, Northlight Financial, LLC, whose offices are located down the hall from UCC's New York office. (Id. ¶¶ 128-129.)

D'Loren and Northlight recommended that TSC obtain the new bridge loan from Fortress. D'Loren represented that TSC would be able to pay off the Fortress bridge loan and achieve permanent securitization within 90 to 120 days. In January and February 2004, D'Loren and other UCC representatives, as well as Roboff and her representatives, participated extensively in negotiating the Fortress loan, which closed in March 2004.[1] (Id. ¶¶ 130-131.)

---

[1] Defendants' earlier motion to dismiss revealed that the Fortress bridge loan exceeded $12 million.

In April 2004, Roboff's advisors informed TSC that Roboff repudiated the Operating Agreement and disavowed her membership in TSC. In the months thereafter, Roboff continued to disavow her membership in TSC and, according to TSC, Roboff actively sought to sabotage TSC's efforts to sign more members. In the spring and summer of 2004, Roboff withheld her royalty revenue from TSC's lockbox, despite her contractual obligations under the Operating Agreement and the Subscription Agreement to pledge her catalog and its revenues as security for the Fortress loan. Moreover, TSC and Fortress repeatedly informed Roboff and her advisors that, without Roboff's royalty revenue, TSC would be unable to function. (Id. ¶¶ 132-133.) In November 2004, Fortress informed TSC that it was in default on the Fortress bridge loan because of, among other reasons, Roboff's failure to pay her royalty revenue into the lockbox. (Id. ¶ 134.)

TSC alleges in its first claim for relief that Roboff failed to fulfill her obligations under the Operating Agreement and she committed a substantial and material breach of the Operating Agreement when she repudiated it in April 2004, declared herself no longer a member of TSC, and withheld her royalty revenue from TSC's lockbox. The second claim for relief alleges in its entirety:

> Pursuant to the Operating Agreement between Third Party Defendant Roboff and TSC and as a result of Roboff's conduct as alleged herein, Third-Party Defendant Roboff is liable to indemnify and reimburse TSC for all damages suffered by it as a result of Roboff's conduct as alleged herein, including, but not limited to, any damages that may be assessed against it pursuant to any judgment that may be awarded to Plaintiff Johnson.

(Id. at ¶ 141.)

7

Before the instant suit commenced in this Court, Roboff filed suit in New York state court against Mason, Carr, D'Loren, TSC, UCC, and Fortress alleging, among other things, that she was fraudulently induced to join TSC and to contribute her multi-million dollar music catalog to TSC, which was in turn pledged as collateral for the Fortress bridge loan. She further alleged the defendants induced her to join TSC and to contribute her catalog by agreeing that TSC would pay her a $600,000 consultant's fee. Considering the computation of other amounts Roboff would owe under the Operating Agreement, the $600,000 fee was designed to limit her exposure to $275,000 in the event of default or the inability of TSC to obtain permanent financing. TSC failed to pay this amount to Roboff. Further, when Roboff exercised her "put right" to return her membership shares to TSC in exchange for reconveyance of her music catalog and release of Fortress' lien upon payment of her share of TSC's outstanding debt, Fortress contended it was entitled to interest on Roboff's pro rata share of the unpaid principal balance of the Fortress bridge loan as well as a twenty percent (20%) premium TSC owed Fortress under the loan agreement. When TSC could not pay these amounts, Roboff funded the amount due, which was at least $650,000, and she sought reimbursement from TSC.

Roboff obtained a preliminary injunction from the New York state court directing TSC to take all steps to execute documents to allow Roboff to exercise her "put right," obtain return of her catalog, and the release of all liens. Roboff posted a bond in the amount of $1 million. When TSC did not execute the documents, the

8

court appointed Roboff as temporary receiver for the sole purpose of executing and delivering the documents in the name of TSC. Roboff settled her case against Fortress. (Docket Entry No. 102, Einstein Aff. ¶ 3.)

On May 31, 2006, the New York state court dismissed Roboff's case without prejudice on the ground of *forum non conveniens*. On June 1, 2006, Roboff's counsel contacted this Court by letter and withdrew the portion of Roboff's pending Motion to Dismiss or for Certain Alternative Relief which had argued that the New York action should proceed and this Court should either dismiss or stay the claims TSC made against Roboff in this action. (Docket Entry No. 112.) Roboff concedes through counsel that her "claims against TSC in the New York Action are in many respects identical to the defenses and offsets she would be forced to assert here if TSC's claims against her are allowed to proceed before this court."[2] (Docket Entry No. 102, Einstein Aff. ¶ 9.) Roboff now moves to dismiss the two claims TSC has brought against her. Alternatively, if the claims are not dismissed, she asks the Court to sever the third-party action and provide her a separate trial.

## II. STANDARD OF REVIEW

In evaluating TSC's third-party claims under Rule 12(b)(6), the Court must accept as true all of TSC's allegations and resolve all doubts in TSC's favor. See <u>In re Comshare, Inc. Sec. Litig.</u>,

---

[2] Roboff asserts that, if her motion to dismiss is granted, she will recommence suit in Tennessee state court. Because she and TSC are Tennessee citizens diversity jurisdiction is lacking, and she does not plan to assert a securities fraud claim that would establish federal jurisdiction.

9

183 F.3d 542, 547 (6th Cir. 1999). The Court should not dismiss the claims unless it appears beyond doubt that TSC cannot prove any set of facts in support that would entitle it to relief. See id. In general, a claim must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. <u>Scheid v. Fanny Farmer Candy Shops, Inc.</u>, 859 F.2d 434, 436 (6th Cir. 1988). The issue before the Court is not whether TSC may ultimately prevail on its claims, but whether TSC is entitled to offer evidence in support of its claims. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974)).

### III. ANALYSIS

**A.    Indemnity claim**

The first contention Roboff raises is that TSC's indemnity claim, appearing as the second claim in the Third-Party Complaint, should be dismissed for failure to plead the basis for the claimed indemnity.

Although Federal Rule of Civil Procedure 8(a) permits a party to include in a Complaint "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" TSC's skeletal pleading in the second count is insufficient to put Roboff on notice of any specific indemnity right arising from an express written contract between the parties. TSC alleges only:

> Pursuant to the Operating Agreement between Third Party Defendant Roboff and TSC and as a result of Roboff's conduct as alleged herein, Third-Party Defendant Roboff is liable to indemnify and reimburse TSC for all damages suffered by it as a result of Roboff's conduct as alleged herein, including, but not limited to, any damages that may be assessed against it pursuant to any judgment that may be awarded to Plaintiff Johnson.

10

(Third-Party Complaint ¶ 141.) As far as any contractual right to indemnity is concerned, this language fails to satisfy Rule 8's liberal pleading standard because it does no more than inform Roboff of "a bare averment of liability." See Toberman v. Copas, 800 F. Supp. 1239, 1243-1244 (M.D. Pa. 1992). TSC argues in its opposing Memorandum at pages 23 and 24 that Roboff is liable for indemnity due to an express indemnity obligation appearing in Paragraph 3.12.3 of the Operating Agreement. The existence and applicability of this indemnity provision, however, is not pled in the Third-Party Complaint. The vague language in the Third-Party Complaint, alleging that "[p]ursuant to the Operating Agreement" Roboff has an obligation to indemnify TSC, does not specifically direct Roboff's notice to Paragraph 3.12.3 of the Operating Agreement. Consequently, the Court will not consider mere argument concerning it.

TSC also contends that Roboff is liable on a theory of implied indemnity because she breached the Operating Agreement and, but for her breach, TSC would not have defaulted on the Fortress bridge loan and subsequently faced damage suits brought against it by other songwriter-members. The Court agrees that, taking the facts of the Third-Party Complaint in the light most favorable to TSC, TSC has alleged a direct line of liability between TSC as third-party plaintiff and Roboff as third-party defendant sufficient to satisfy the procedural requirement of Federal Rule of Civil Procedure 14(a). See Moorehead Constr. Co. v. City of Grand Forks, 508 F.2d 1008, 1012 (8th Cir. 1975); Toberman, 800 F. Supp. at 1242;

11

Morris v. Lenihan, 192 F.R.D. 484, 487-488 (E.D. Pa. 2000). Having pled sufficient facts to support its separate claim for breach of contract against Roboff, the Court finds that TSC's companion indemnity claim may proceed as well. See Houseboating Corp. v. Marshall, 553 S.W.2d 588 (Tenn. 1977); Lusk v. Jim Walter Homes, Inc., 648 S.W.2d 935, 939 (Tenn. 1983) (finding implied obligation to indemnify arising out of relationship of parties); Stiver Marketing, Inc. v. Performance Business Forms, Inc., 1991 WL 254564 at *3 (Tenn. Ct. App. 1991) (observing implied contractual indemnity or "implied in fact" indemnity is generally based on contractual relationship between indemnitor and indemnitee, rather than equitable considerations or tort liability). Whether TSC will ultimately be entitled to prevail on its indemnity claim against Roboff if TSC is found liable on plaintiff's federal securities law claim is a question best left for resolution after the completion of discovery. See e.g. In re Continental Airlines, 203 F.3d 203, 215-216 (3rd Cir. 2000) (federal courts disfavor indemnity for federal securities law violations).

The Court rejects Roboff's contention that the Court cannot exercise supplemental jurisdiction over the breach of contract claim pursuant to 28 U.S.C. § 1367(a). TSC does not assert breach of contract as an independent claim against Roboff improperly impleaded under Rule 14; rather, TSC formulated the claim in an effort to pass on to Roboff all or part of the alleged liability TSC faces, which is proper third-party pleading. See GE Healthcare Financial Servs. V. EBW Laser, Inc., 225 F.R.D. 176, 180 (M.D.N.C. 2004). TSC's claims for breach of contract and indemnity are so

12

closely related to the plaintiff's claims against the defendants, over which the Court has original jurisdiction, as to form part of the same case or controversy. Thus, the Court's exercise of supplemental jurisdiction is appropriate.

**B. Alternate Relief**

Federal Rule of Civil Procedure 42(b) allows this Court to order a separate trial of any claim to promote convenience and economy or to avoid prejudice. American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 474 (6th Cir. 2004). The Court has discretion to decide whether such a severance is warranted. Id.

Having carefully reviewed the record, the Court concludes that the facts of plaintiff's claims and TSC's claims are so intertwined that it makes logical sense to try all of the claims together. The Court is confident that, with the guidance of able counsel, the jury will comprehend the various transactions at issue and will understand the role of each litigant, including Roboff. Her presence in this lawsuit will actually serve to complete the picture for the jury, since it appears that Roboff was extensively involved in forming and promoting TSC. Any potential prejudice that may arise can be minimized through evidentiary rulings and the Court's jury instructions. As such, the Court declines to exercise its discretion at this stage to sever Roboff's case and grant her a separate trial. Likewise, the Court will not stay discovery that is already underway and is pertinent to all claims. Should discovery reveal a basis for renewing the motion for severance, the Court will consider such a motion at a later time.

13

## IV. CONCLUSION

For the reasons stated, that portion of the Motion of Third-Party Defendant Annie Roboff to Dismiss and for Certain Alternate Relief (Docket Entry No. 100) that has not been withdrawn by her (Docket Entry No. 112) will be DENIED.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE